Okay, the next argued case this morning, December 21, 2063, Incept LLC v. Palette Life Sciences, Incorporated. Mr. Greenblatt. Good morning. Thank you, Your Honors. May it please the Court. Incept respectfully submits that the Board committed multiple errors in this case in its analysis of the 723 and the 913 patents and that they require reversal and remand. I want to focus on the two main issues, the Board's decision on anticipation with respect to various claims of the 723 patent, in particular Claim 1, and then the Board's decision on obviousness with respect to some other claims in the 723 patent and then all the claims of the 913 patent. So starting with anticipation, the Board's decision here was based on an improper legal framework for assessing anticipation by the Wallace reference. As we explained in our brief, the Board, you know, what they resorted to is picking and choosing, selecting different sections of the Wallace reference, rather than applying the framework of looking for a disclosure of not only just the limitations in the reference, but all the limitations arranged in the same way as claimed by, in this case, Claim 1 of the 723 patent. And under that analysis, the Wallace reference, there's no substantial evidence that would show the Wallace reference discloses the invention of Claim 1 as arranged in that claim. The Wallace reference, as we explained, it discloses millions, potentially billions of potential compositions for wide-ranging applications, tissue augmentation, sealants, drug delivery systems, wide-ranging applications. And there's one sentence that refers to a potential application as a large space-filling device, but there's no identification of what composition would be used for that device, let alone the properties of that composition or how they'd be arranged in the same manner as in Claim 1. And everyone... Counsel, to move things along, let's assume, for the sake of this morning's argument, that there is a strong point to be made that the technical criteria of anticipation may not have been met. How about obviousness? Yes, Your Honor. On obviousness, so there's Claim 16, would be the dependent claim of the 723 patent that is just obvious based on Wallace, and then all of the claims of the 913 patent are based on obviousness. And that anticipation analysis absolutely infected... The anticipation analysis infected the obviousness analysis because the board reading the decision was viewing Wallace as anticipating and did not explain which limitations would have been missing from Wallace, how the gap filling would have been there. So it was a very... On the gram factor analysis, the scope and content of the prior art, as we explained, we believe that was skewed, if you will, by the improper anticipation analysis. So that's on just the reading of Wallace's scope and content of the prior art. And Wallace, as we talk about, also talks about how it's not readily degradable, essentially non-degradable. Wallace isn't disclosing this key limitation of removable by biodegradation. What the experts keep talking about and what the board pointed to, what Pallett's expert was referring to and the board pointed to, was that Wallace refers to the option of including biodegradable segments or blocks in the composition, but it doesn't describe a composition that's removable by biodegradation. It just says there's this option of including some type of segment that's biodegradable, but there's no disclosure of how that results in removable by biodegradation, Your Honor. And then, in addition, as we explained, the board made a fundamental error in not considering the evidence of commercial success, the secondary factors of commercial success, which INSEPT presented significant evidence of commercial success. And what the board found on that issue was that INSEPT had not met its burden of production and never considered that in the context of a proper gram analysis. The board said INSEPT had not met its burden of production and then stopped the analysis right there. And, in fact, the board never shifted the burden on secondary factors from INSEPT. The board even said that it did not reach the issue of nexus, for example, because INSEPT had not met its burden of production on commercial success. So the board kept the burden. Can I just ask, can one read the board's decision as saying, we have some real difficulty with some of the details of the submission on commercial success, that it wasn't maybe new patients as opposed to returning patients, that the use of a one-third rate figure from a British study didn't really seem to be right. But, in any event, the prior art component of the analysis is so very strong, and the recency of Wallace makes any commercial success here just not a basis for inference of non-obviousness, because Wallace is, what, less than a year or something ahead of the priority date here? And the fact that there wasn't a commercial product out there in the marketplace based on that prior art doesn't really tell you that when the next art, namely this, comes along, that the fact that it is successful means that it wasn't obvious in light of Wallace. Your Honor, respectfully, I don't think you can read the board's decision that way. The board did not make those findings. So the board did not do an analysis where it said those are legal components, right? I mean, the relationship in the overall analysis of the prior art facts and the secondary consideration facts, that goes into what is now a legal hopper. The legal conclusion on obviousness? Yes, Your Honor, absolutely. The board didn't get there, though. But we can do that. On obviousness, we do think on anticipation that could be reversed. On obviousness? Right, anticipation becomes immaterial if obviousness is left out, right? In our view, Your Honor, the proper course would be remanding that to the board since the board was clear that it didn't reach the issue of commercial success because we hadn't met our burden of production was what the board found. And then the board also said it didn't even get to the issue of nexus, which we certainly believe there's sufficient evidence of nexus between the space or product and the claims, but the board never reached that issue. So we've been doing this as the proper course would be a remand. And the board never did reach those conclusions to your earlier question, Your Honor. The board never said that the commercial, you know, never reached this analysis where weighing the commercial success, the board just found that INSEPT had not met its burden. And we maintain that INSEPT produced substantial evidence of commercial success. You know, this product was approved by the FDA in 2015 and then was immediately met with significant success. First Augmentix between 2015 and 2017 showed, you know, doubling of sales volume. Boston Scientific acquired Augmentix based on this product for $500 million with milestones, and it continued to be very successful. Dr. Shoalwater, our expert, looked at the market. Even though, you know, market share is not a requirement as we talk about in our brief, Dr. Shoalwater looked at the market and concluded that, you know, there's approximately 55% The success didn't occur until 14 years or something after or 12 years or something after the priority date. Why doesn't that tell you that the non-market presence after Wallace, which is 2001, and this one's 2003, is just not very significant? It took your people a dozen years to get it into the market. Well, it took Augmentix a while to get it into the market for sure and then to do the testing and getting FDA approval. We do believe, Your Honor, that Wallace issued in 2003 and the fact that no one else was releasing a product like this, you know, setting aside the priority date of the patents, but the fact that no one else was rushing to market with this after 2003 is a classic example of how it's not obvious that, you know, if it would have been so obvious based on Wallace, so straightforward based on Wallace, you know, why wouldn't someone else have done it? Why was no one else coming to the market with this product? And so we do think this is a situation where the commercial success is highly relevant and goes to this question of, well, if it was so obvious, why didn't anybody else do it? And the commercial success evidence, it was simply not considered by the board, according to the board's decision, because we did not meet our burden of production. We believe we clearly did. On the dependent claims as well, on the question of obviousness, this would be in particular Claim 16 on the 723 patent and Claim 6 on the 913 patent. These dependent claims get into more details of the specific time for the removability by biodegradation, with Claim 16 talking about 3 to 12 months, Claim 6 being less than approximately 90 days. And this further highlights the board's errors in analyzing Wallace, where Wallace does not disclose these time frames for biodegradation. And again, all Wallace says is there's an option of including biodegradable segments. It doesn't provide any more details on that, and it certainly doesn't talk about removing something by biodegradation within these time frames. And so on Dependent Claims 16 and 6, we submit that these are further instances where the board committed independent errors in its analysis of Wallace. What about Claims 2 through 5? Are they also? 2 through 5, Your Honor, of the 723? Yes. Claims 2 through 5, Your Honor, that would be on obviousness. And with Claims 2 through 5, those are really, the errors are one and the same with Claim 1 of the 723, with the misreading Wallace and not considering the secondary factors. We don't, on those claims, have an independent argument for non-obviousness. And if there aren't further questions, I'll reserve my time. Okay, we'll save the rest of your time for rebuttal. Let's hear from the other side. Mr. Chau. Mr. Kong, good morning, Your Honors. May it please the Court. Substantial evidence supports the board's findings that a skilled artisan would understand Wallace, either alone or in combination with other references, to disclose or, excuse me, render obvious all claims of the 723 patent and all claims of the 913 patent. Substantial evidence also supports the board's finding that Wallace anticipates certain claims of the 723 patent. Now, INSEPT's appeal implicates the substantial evidence standard, but INSEPT's arguments focus on isolated excerpts from Wallace rather than on the totality of the record as a whole. Now, here, the record as a whole includes the four corners of Wallace. It includes expert testimony provided by our experts regarding the content of Wallace. And it also includes the board's determination that the credibility of INSEPT's experts, who testified about the content of Wallace, was just not there. I think the words they used were, we do not assign persuasive weight to their testimony. And every time, in the final written decision, the court addresses their testimony, it discredits it. So when that record is viewed as a whole, as required under the substantial evidence standard, INSEPT's arguments fall short of it. In addition, INSEPT's appeal attempts to raise a number of factual issues that were not disputed below, including a new argument that Wallace teaches away from a biodegradable filler, a new argument that Wallace's disclosure of its compositions as a space filler for organ displacement used during radiation therapy, somehow does not map to the claims at issue here, and new arguments regarding dependent claims that were not separately argued below. Your Honor just pointed out claims two through five. Those claims were not identified at all in the opening brief. The only place they come up is in the reply. And under this Court's precedent, if it's not in the opening brief, it doesn't count. It's not on the field. But six and 16, respectively, were argued separately below? Six and 16 had separate arguments regarding... Right. So what's your answer to INSEPT's criticism of the Board's treatment of those? The Board relied on the totality of the Wallace reference, which discloses biodegradability in numerous places, including an extensive discussion of the topic in columns, I believe it's 19 and 20. It credits the testimony of Dr. Dicker, our expert, who testified that one of Skilnier, who reads those disclosures, and those disclosures talk about not only biodegradability but also the rate of biodegradability. Specifically, they compare collagen to another form of collagen and say that this other form of collagen will biodegrade at a faster rate. It may be ideal for certain purposes. So the idea of the time at which something will biodegrade is discussed in Wallace, and Dr. Dicker testified that one of Skilnier reading that would understand how to tune... Does Wallace ever talk about biodegradation of the entirety of an insert as opposed to components, which is, I think, what I understood your friend on the other side to refer to? That issue came up in briefing for the first time, this notion of entirely removable by biodegradation. So first of all, the word entirely is not in the claim. It's just removable by biodegradation, so we're not sure where that argument is coming from. What is it in the claim that's removable by biodegradation? The filler. The filler. The filler. That sounds like the filler. Correct. The whole thing. The whole thing by biodegradation, correct. I thought I was hearing your friend on the other side this morning say, Wallace refers to biodegradation, but never as to the entirety of the filler. Right. So removable via biodegradation. So the body's processes can remove that filler via biodegradation. It doesn't say obliterate, reduce it to its atoms. It just says remove it from its place in the body. For example, Devon Villiers' space. Remove it from that space. So Wallace doesn't say it will entirely remove from the space, but the concept of biodegradation clearly contemplates that it will degrade and the body's processes will remove it from that place and flush it out of the body. And again, the testimony of Dr. Dicker regarding the timing of biodegradation was credited by the board. He said that one could tune biodegradation to hit those time points. And the testimony against that offered by Dr. Winnick, I believe, on the other side, was discredited by the board. So substantial evidence supports the board's findings regarding both of those claims. Can you address the commercial success analysis, which was fairly limited on the board's part? So Incept bears the burden of production. That was assigned correctly to them. They hold all the cards in an IPR. So it's not a district court action. I can't see discovery from them regarding commercial success. They hold all the cards. They produce whatever they want to produce. Here they produced a single card, and that was a sliver of information regarding units shipped, so units that left the door of Incept and went out into the world. The testimony of Ms. Ray, who's Incept's witness who testified about this data, said that that's only units shipped. And units shipped includes three things, units sold, samples, which are free, and also replacement parts, which aren't sold. They're replacements. Because they relied on units shipped and because Ms. Ray testified that units shipped is not units sold, the board couldn't decipher what to do with the unit shipped information and said that doesn't meet your burden of production on commercial success because units shipped doesn't tell us anything about success. It tells us how many products left the door, and that's it. So the other problem here was that we heard some testimony about or some argument about market share and this 55% market share figure that Incept has thrown around. Well, there's two problems with that. The first is that it relies on units shipped. It's not units sold, but units shipped. That's the numerator of the equation. The denominator of that equation is a number. It's about 170,000, which they say are the new cases in 2019. So there are 170,000 new cases of prostate cancer in 2017. They adjust that number by one-third, citing to the U.K. study, which Your Honor pointed out. One thing Your Honor did not point out is that that U.K. study, it was designed to randomize the about 1,000 patients into one of three treatment groups, one of which was radiation. So by design, one-third of those patients ended up in the radiation treatment group. Yet Incept takes that design element of a clinical study and applies it more generally to the entire patient population in the United States. It says, oh, well, if it was one-third in this one study, it's got to be one-third in the U.S. But there's no basis for them to extrapolate that one-third figure in that matter. So both the numerator and the denominator of this 55% market share estimation they provide have serious questions, and the board pointed out all of those questions. And they did so reasonably. Can you remind me, your evidence on the topic of commercial success was what? We didn't produce any evidence. We don't hold any of those cards. So they hold all the cards. We couldn't seek discovery. They produced a sliver of evidence that we criticized. And you criticized, lawyer criticized or expert criticized? We had an expert criticize that as well. It was Dr. McDuff. So the sum total of commercial success is units shipped without any information in 2018 or 2019 regarding how many of those units were actual sales, how many were samples, how many were replacement parts. And that's notable here because in 2018, that's when Boston Scientific took over the product. So did they change the marketing practices? Did they offer more free samples? What's a replacement part for a product that's designed to biodegrade and disappear after some months? So if it breaks during shipping or if a doctor doesn't apply it correctly. Replacement pre-insertion. Replacement pre-insertion. I don't know the details. I would assume it's pre-insertion. If a doctor screws it up, I don't know if they'd have a right of return or not. But the board actually went further. My friend on the other side here said the board did not consider the issue of commercial success. The board actually did. They said even if we consider units shipped to be units sold, which is what they asked, even if they were to make that step, which they didn't want to make, but even if they were, that information in isolation isn't helpful. The number of units sold in a given year doesn't tell you how much money came in the door, how many discounts were given, was that product bundled with another product. So that number of sales standing by itself does not provide evidence of commercial success, and that's what the board found. So on the issue of commercial success, there is one sliver of evidence, units shipped. If INSEP truly had a product that was so market dominant, they would be flush with information they could produce on that topic. But they produced none of it. They produced units shipped. Thank you. Thank you, Ronna. Mr. Rafferty? Yes, thank you, Your Honor. On the topic of Wallace, Wallace does not talk about removing by biodegradation. Again, it's in Column 19. It talks about an option of including biodegradable segments or blocks. It also talks in the patent about using that so you could release drugs, for example, from a composition. You could have a portion of the polymer degrade so a drug is released. But it's talking about an option of including these biodegradable segments, and it just doesn't talk about removing a composition by having it degrade. And so that gets back to our point earlier about how no one's talking about inherency. The board didn't rely on inherency. The question is, does Wallace expressly disclose the same composition, the same range as claimed in Claim 1 of the 723 patent? And we don't believe the evidence supports such a finding here. And the board's decision at Appendix 19, for example, even talks about in Wallace adapting compositions for different uses. In adapting, you're changing things in some way. And, again, it's really an obvious analysis with Wallace that the board relied on and not an anticipation analysis. Again, Claim 16 and Claim 6, we squarely raise those separately for why they're not obvious based on the law. Can I just be clear? So in the Wallace discussion of segments and blocks, we're not talking about, like, I mean, an engine with big chunks that are segments. We're talking about essentially molecule-level segments, which if they biodegrade, the rest falls apart. So you are actually talking about the whole thing disappearing. Well, Wallace refers, Your Honor, it is talking about molecules. And the polymer may include biodegradable segments and blocks, and that's the level of detail it's at. And so if you're talking about, and it talks about applications where, for example, a segment could degrade to release a drug, that would not be the entire molecule, the entire polymer necessarily degrading. That would be a portion of it. And so that gets back to the point I was making about how Wallace just doesn't talk about removing something through biodegradation. It talks about having sections degrade and perhaps to release a drug or some other molecule for some other purpose, but it just doesn't talk about removing a composition by biodegradation. And then that's the example that we've highlighted for why the Board's anticipation analysis was so flawed, that that's just not disclosed in Wallace. The Board didn't rely on inherency. Wallace doesn't talk about that. It doesn't disclose removing by biodegradation. And then on commercial success, to touch on those points as well, there absolutely was evidence of actual sales. INSEPT did produce the evidence they relied because it was consistent throughout the records, was units shipped. But in Ms. Ray's declaration that we submitted, she explains that, for example, in 2015 there was a little over 1,000 units shipped. 914 of those were regular sales. In 2016, about 3,900 units shipped. About 3,700 of those were regular sales. 7,100 units and chains in 2017, and about 6,800 of those were regular sales. That's in her declaration. And so that's when she's talking about how it's, we're talking about replacement units and samples. That's a small portion of the units shipped. The bulk of the units shipped are sales. And the other factor is, too, the fact that Boston Scientific acquired INSEPT, that this reached commercial success so quickly. Dr. Shoalwater talked about how he hadn't seen anything like this and how successful it was in his practice and how helpful it was in his practice. All of these, the totality of them, show evidence of commercial success that the board should have considered. And for that reason and obviousness, we believe, we ask the court to respectfully remand the decision. Anything else? Any more questions? Thank you. Thanks to both counsel. Thank you. This is taken under submission.